ARKANSAS DEPARTMENT OF CORRECTION EX REL TERRELL
DON HUTTO, COMMISSIONER OF CORRECTION v. ANDY
DOYLE

5-6205                                        491 S.W. 2d 602

Opinion delivered March 19, 1973

*Ray Thornton,* Atty. Gen., by: *Robert H. Crank,* Asst.
Atty. Gen., for appellant.

*Harkey & Walmsley,* for appellee.

J. FRED JONES, Justice. This is an appeal by the Arkansas Department of Correction, hereinafter called the state, from a circuit court judgment on a jury verdict in favor of Andy Doyle on his counterclaim for set-off against farm rent he owed the state in the amount of $29,291.90 and judgment over against the state in favor of Doyle for $684.56.

The facts as near as we can determine from the record before us, appear as follows: On November 6, 1969, the state entered into a lease agreement with Mr. Doyle whereby Doyle, as highest bidder, leased for the crop years 1970 and 1971 a part of Tucker State Prison Farm in Jefferson County, Arkansas, described as two tracts in the lease as follows:

"Consisting of 1,500 acres, more or less, known as the One Camp area with an assigned allotment of

300 acres rice and 200 acres cotton, and 1,800 acres, more or less, known as the Two Camp area with an assigned allotment of 300 acres rice and 200 acres cotton."

Under the terms of the lease Mr. Doyle agreed to pay an annual rental of $103,651.50 to be paid in installments as set out in the lease. He paid the agreed rent for 1970 and paid two of the installments in the total amount of $74,359.60 for 1971. In that year a controversy arose between the parties and Mr. Doyle withheld, and refused to pay, the balance of the agreed rent for 1971 in the amount of $29,291.90.

The state filed suit against Mr. Doyle for the balance of the 1971 rent due under the contract and also alleged in its complaint that in February, 1970, the United States Department of Agriculture reduced the rice allotment by 15% on the entire state farm and thereby reduced the rice allotment on the lands leased to Mr. Doyle from a total of 600 acres to a total of 510 acres. The state then alleged that Mr. Doyle planted 575.8 acres of rice on the leased land in 1970 and 594.2 acres in 1971, and that because Mr. Doyle overplanted his rice allotment for these two years, the state was forced to plow up 65.8 acres of rice it had planted on its own acreage in 1970 and 84.2 acres in 1971, in order to avoid a marketing quota penalty for overplanting its overall allotment on the entire farm. The state alleged that the defendant's refusal to plow up his overplanted allotment damaged the state in the amount of $9,791 in 1970 and $18,591 in 1971. The state also alleged in its complaint other elements of damage for waste committed by Mr. Doyle on the leased lands and prayed judgment against Doyle for all three items.

Mr. Doyle filed an answer and counterclaim. His answer was of general denial and his affirmative counterclaim, as amended, is as follows:

"He states that he is entitled to a set-off against the payment required under the lease in the amount of $29,021.25 because of a forced reduction in his rice planting, and because the plaintiff improperly computed the cotton allotment payments to him.

That he is entitled to a set-off in addition to the reasons stated in the original answer for the reason that the Plaintiff improperly took approximately ten (10) acres of property covered by the Defendant's lease and used same in the construction of a landing strip for aircraft."

At the trial of the case the state introduced the lease agreement and the parties stipulated that $74,359.60 had been paid on the 1971 rent and that $29,291.90 was withheld from payment by Mr. Doyle, whereupon the state rested its case. At this point the trial court granted Mr. Doyle's motion for a directed verdict as to the alleged damages for waste committed on the property, and Mr. Doyle went forward with the proof in support of his counterclaim. The verdict of the jury is not in the record except as contained in the "judgment on the verdict" which appears as follows:

". . . said jury retired to consider its verdict; and after deliberating thereon, returned into court the following verdict:

'We, the jury, on instructions of the court, find for the Plaintiff on its complaint in the sum of Twenty-Nine Thousand Two Hundred Ninety-One Dollars and Ninety Cents ($29,291.90).

We, the jury, find for the Defendant on his counter-claim in the amount of Twenty-Nine Thousand Nine Hundred Seventy-Six Dollars and Forty-Six Cents ($29,976.46)'.

IT IS THEREFORE BY THE COURT CONSIDERED, ORDERED AND ADJUDGED that Andy Doyle do have and recover of and from the State of Arkansas in accordance with the verdict of the jury, Six Hundred Eighty-Four Dollars and Fifty-Six Cents ($684.-56) and interest thereon from this date until paid at the rate of six per centum per annum; together with all his costs herein paid, laid out and expended; for all of which execution may issue."

The state first contends that the trial court erred in entering judgment over against the state of Arkansas on

the counterclaim and we agree. Article 5, § 20, of the state Constitution. In *State* v. *Ark. Brick & Mfg. Co.,* 98 Ark. 125, 135 S.W. 843, and *State ex rel Attorney General* v. *Lovett-Carnahan Co.,* 179 Ark. 43, 14 S.W. 2d 233, we held that in a suit by the state against an individual, only the amount the state owes the individual may be set-off by counterclaim against the amount an individual owes the state, where both claims arise out of the same transaction.

The state next contends that there was not sufficient competent evidence to support the verdict of the jury on the counterclaim and with this contention we also agree. Since we are unable to find supporting evidence for the jury verdict, we review the evidence in some detail.

Mr. Doyle's counterclaim was based on three elements of alleged damage. 1. Forced reduction in rice planting. 2. Improper computation of cotton allotment payments and, 3. the taking of 10 acres of his leased land for an airstrip. The burden was, of course, on Mr. Doyle to prove these elements of damage and the amount thereof. For evidence on the first two of these elements, Mr. Doyle relied heavily on the answers to interrogatories he had propounded to the state on pretrial discovery. The pertinent interrogatories and answers thereto appear as follows:

"INTERROGATORY NO. 11: State the total cotton allotment for all of the lands owned by the plaintiff for the years 1970 and 1971 and the payment rate for cotton per acre for such years.

ANSWER: A. The 1970 allotment for the Arkansas Department of Correction was 2073.0 acres. The domestic allotment was 65% of 2073.0 acres which was 1347.4 and this acreage was the payment total or what the United States Department of Agriculture would pay a subsidy payment on. The support payment was based on 16.80 cents per pound which was 705 # projected yield per acre. The payment rate per acre was $118.44 for calendar year 1970.

B. The 1971 cotton base allotment for the Arkansas Department of Correction was 1398.4 acres which also

was what the United States Department of Agriculture payment was based upon and actually any amount of cotton acreage could be planted on any farm, at least 90% of the base acreage had to be planted. The payment rate was $99.00 per acre which was figured by a 660 # projected yield payment times 15 cents per pound support payment.

INTERROGATORY NO. 12: State the amount paid to the defendant for such years.

ANSWER: A. The amount of support payment or subsidy assigned to Andy Doyle by the United States Department of Agriculture in 1970 was as follows:

1. 1970 Cotton support (Andy Doyle)  $ 32,747.06
2. 1970 Cotton support (Dept. of Corr.)  126,839.00
   Total Cotton support payment. . .  $159,586.06

B. The amount of support payment on subsidy assigned to stockholders on Twin Rivers Farms by the United States Department of Agriculture in 1971 was as follow;

1. 1971 Cotton support (Twin Rivers
   . Farms)  $ 30,595.59
2. 1971 Cotton support (Dept. of Corr.)  107,846.01
   1971 Total Cotton support payment. . .$138,441.60

INTERROGATORY NO. 14: State the rice allotment in acreage for all of the lands of the plaintiff for the years 1970 and 1971.

ANSWER: A. The Department of Correction 1970 Rice allotment was 2197.6 acres on January 8, 1970 which was a reduction of 14.08% from calendar year 1969.

B. The Department of Correction 1971 Rice allotment was 2197.6 acres on January 1, 1971 which was the same as the previous year 1970."

We now examine the evidence that went to the jury as to the rice, cotton and airstrip in that order. It was

stipulated that when the Department of Agriculture reduced the state's 2,200 acre rice allotment by 15%, the state so advised Mr. Doyle and the state advised that it wanted him to reduce his 600 acre rice allotment by 15% *but Mr. Doyle objected*. It was further stipulated that when the state made this request of Mr. Doyle, it did not offer to reduce the rent which he had agreed to pay.

The lease agreement was read to the jury and a copy of it was left with them. Mr. Doyle's attorney obtained permission of the court to read to the jury certain of the interrogatories and answers propounded by him to the state. As to the rice acreage reduction, he read to the jury the interrogatories and answers as follows:

"Question: State the rice allotment in acreage for all of the penitentiary lands for the years 1970 and 1971.

Answer: The Department of Correction 1970 rice allotment was 2197.6 acres, which was a deduction of 14.08 percent from the calendar year 1969.

The Department of Correction 1971 rice allotment was 2197.6 acres on January 1, 1971."

Mr. Eugene Johnson was then called as an expert witness for Mr. Doyle. He testified that he is employed by the Jackson County Agricultural Stabilization Conservation Service as a program specialist and compliance supervisor and went with Mr. Doyle to look at the state land involved in this case when Mr. Doyle was thinking about bidding on it. He testified that he was familiar with the income from rice lands in the area of Jackson County and that from the standpoint of yield and profit he would consider the rice lands leased by Mr. Doyle in Jefferson County about the same as that in Jackson County. He then testified that rice land should normally yield in the neighborhood of 90 to 100 bushels per acre; that the average price per government report for the past few years had been $2 to $2.30 per bushel, but that the buyers actually paid during the past two years between $2.35 and $2.50 per bushel. This witness then was asked to multiply the average yield of rice per acre by $2.50 and testified that the normal income from rice land would be

$225 per acre. This concluded the *proof* on the alleged loss sustained by Mr. Doyle as to the reduction in his rice allotment.

Mr. Doyle did not testify in this case and there is not one syllable of evidence in the entire record as to the number of acres he actually planted in rice, the number of bushels per acre the land actually produced, or the market price he received for the rice he did plant. If Mr. Doyle did plant 575.8 acres of rice in 1970, as *alleged* by the state, that was only 24.2 acres short of his full lease allotment and there is no evidence at all in the record as to why he failed to plant the full 600 acres. If Mr. Doyle did plant 594.2 acres of rice in 1971, that was only 4.8 acres short of his full 600 acre lease allotment and likewise there is no evidence at all as to why he did not plant the other 4.8 acres. The *evidence* on this item consisted only of expert testimony as to the productive capacity of the land and the general market price of the rice rather than the number of acres planted and the reasons for not planting the full lease acreage allotment if such was the case.

Turning now to the cotton subsidy payments, the 400 acre allotment was not actually questioned or involved in this case and *subsidy*, as such, was not mentioned in the lease. All the evidence on this item was derived from answers to the interrogatories propounded to the state by Mr. Doyle and the testimony of Mr. Johnson. It appears that the United States Department of Agriculture made subsidy payments on cotton allotment acreage in the amount of $118.44 per acre in 1970 and $99 per acre in 1971. We are concerned here with cash subsidy paid by the government and not with cotton acreage planted or not planted. According to the answers to interrogatories Nos. 11 and 12, *supra,* this subsidy was not paid on the total cotton allotment but was paid on what was termed "domestic" cotton acreage allotment which was only 65% of the *total* cotton allotment acreage and on the entire state farm amounted to 1,347.4 acres in 1970 and 1,398.4 acres in 1971. Answer A to interrogatory No. 12 says that the amount of support or *subsidy* assigned to Andy Doyle *by the United States Department of Agriculture* in 1970 was $32,747.06 and for 1971 it was $30,595.59. There is

no evidence in the record whether Mr. Doyle did or did not plant, harvest and sell the full 400 acres of cotton allotted to him under his lease.

As already stated, Mr. Doyle's attorney requested and received leave of the court to read some of the interrogatories to the jury. As to the subsidy payments, instead of reading to the jury the questions and answers as they were asked and answered (*supra*), the record is simply as follows:

"BY MR. HARKEY: Ladies and Gentlemen, I prepared and filed what we lawyers call interrogatories, which is just a law word meaning questions, for them to answer. I asked them certain questions and they gave certain answers.

One Question: State the total cotton allotment for all of the lands owned by the plaintiff, that is the Arkansas Board of Correction, for the years 1970 and 1971 and the payment rate for cotton per acre for such years.

BY MR. GINGER: We object to this; if he has got some proof on this that is fine but this is a discovery pleading.

BY MR. HARKEY: I have never known of interrogatories to be discovery, Judge, this is filed in the case and the answers were under oath; as I understand the law that is evidence.

BY THE COURT: Overruled. Go ahead.

Answer: The 1970 allotment, and as I was saying these answers were given to my questions to these people under oath, for the Arkansas Department of Correction was 2073.0 acres. The projected payment was based on 16.80 cents per pound which was 705 pounds projected yeild per acre. The payment rate per acre was $118.44 for calendar year 1970. Now, in another answer to interrogatories:

On the 1971 cotton base allotment for the Arkansas Department of Correction, and this was 1398.4 acres.

The payment rate, and I quote their answer, was $99.00 per acre for the year 1971.

I asked them another question: State the amount paid to Andy Doyle for these two years, 1970 and 1971.

Answer: The cotton support payment to Andy Doyle for the year 1970 according to their answer under oath was $32,747.06. The same payment for the 1971 cotton support was $30,595.59, the same amount Mr. McLarty has written up here."

Mr. Eugene Johnson also testified as to the cotton subsidy. He testified that the federal government does not care what part of a farm a cotton allotment is planted on as long as it's under one farm contract. He said that under a landlord and tenant relationship such as that between the state and Mr. Doyle, the federal government did not care how the money for cotton allotment is divided so long as it's fair and equitable. He also said the federal government did not care how many acres of cotton allotment Mr. Doyle got under his lease as long as the total planting was not exceeded. As to the remainder of his testimony pertaining to the cotton allotment, the record is as follows:

"Q. . . . Now you mentioned to the jury earlier, Gene, that you had read these answers that the Board of Corrections gave under oath to these questions I asked; you have read those, have you not?

A. Yes, sir.

Q. I want you to assume for me that Andy Doyle entered a suitable bid and got a lease to 400 acres of cotton; will you assume that, first?

A. Yes, sir.

Q. I want you to assume for me that in these interrogatories which have been read to the jury and are in evidence that for 1970 the support payment would be $118.44 per acre; will you assume that for me?

A. Yes, sir.

Q. Now have you checked these figures at my request on this sheet before you got on the witness stand?

A. $118.00 times 400 acres.

Q. Is this the correct figure?

A. Yes, sir.

Q. I want you to assume that in 1971 the payment was $99.00 per acre; have you checked to see that this figure is correct?

A. Yes, sir.

Q. And have you checked on the board the other figures to see that my arithmetic is correct?

A. No, sir.

Q. You have checked, however, the 1970 and 1971 cotton payments?

A. Yes, sir.

Q. Gene, have you checked the other figuring on the cotton payments for me, forgetting the 10 acres or 15 acres of rice at 24.2, that is the amount Andy should have received assuming the penitentiary took the bids and said, 'You are going to have 400 acres of cotton?'

A. Yes, sir.

Q. Is the difference in the amount paid and the amount he should have received this figure?

A. Yes, sir.

Q. And you have checked that?

A. Yes, sir.

Q. Is the difference in the amount paid and the amount he should have received this figure?

BY MR. BRIDGEFORTH: Your Honor, I object to this is the amount he should have received; that is the whole lawsuit; that assumes a lot more opinion than the man has expressed here so far.

BY THE COURT: Sustained.

Q. Well, Mr. Johnson, just assume that these people told Andy he would pay them $103,000.00 a year and give him 400 acres of cotton and then they were going to take it back; 400 acres times this is this amount, right?

A. Yes, sir.

Q. And have you subtracted the amount paid from this amount computed?

A. Yes, sir.

Q. And is it this figure?

A. Yes, sir.

Q. Have you done the same thing on the 1971 cotton?

A. Yes, sir.

Q. And is it this figure?

A. Yes, sir."

The manner in which the interrogatories and answers were presented to the jury, together with the testimony of Mr. Johnson based on erroneous assumptions, could only have left the impression with the jury that the subsidy was paid to the state on the total cotton allotment for the entire farm in the amounts of $118.44 for 1970 and $99 for 1971, and the state only remitted to Mr. Doyle $32,747.06 for his 400 acre allotment in 1970 and only $30,595.51 in 1971. Such may have been the actual situation but such was not the proof by competent evidence. The

answers as *actually* made to the interrogatories would indicate that the United States Department of Agriculture figured the subsidy payments due Mr. Doyle on his 400 acre cotton allotment exactly as it figured the subsidy due the state, and paid him on the basis of his "domestic" allotment which was 65% of his actual allotment. As already stated, there is no evidence that Mr. Doyle did not plant and harvest 400 acres of cotton, and there is no evidence that the state had anything to do with his subsidy payments.

The state offered as rebuttal, the testimony of Mr. W. B. Abbott, the executive director of the ASCS office at Pine Bluff in Jefferson County. He was asked to state to the jury what the total penal farm cotton allotment was for 1970. Objections to this question were sustained because that question had already been answered in the answers to the interrogatories propounded to the state by Mr. Doyle. He was then asked, "Now could you tell us the distinction between a cotton allotment and the domestic cotton allotment?" Objections were also sustained to this question on the ground that the question had already been answered and it was not rebuttal testimony. We are unable to find the answer to this pertinent question in the record and, we think the trial court erred in sustaining the objection to this question.

As to the damage alleged by Mr. Doyle on the ground that some of his land was taken for an airstrip, Mr. Bill Steed, the prison farm coordinator for 1970 and part of 1971, testified by deposition that the airstrip was under construction and had not been completed at the time Mr. Doyle took over; that the airstrip was a "grass strip" consisting of not over ten acres, located "north of the shop between the main gate and the shop." The record is silent as to the date Mr. Doyle took over in relation to the date of the contract.

Mr. Johnson also testified pertaining to the airstrip. A part of his testimony on this point appears in the record as follows:

"Q. Now I want you to assume for me a couple of things before we get into the larger figures, I want

you to assume for me that the penitentiary took bids from people all over the State and Andy got the high bid for $103,631.50 on 3300 acres of land, assume that first; second, I want you to assume that the penitentiary decided they needed an airstrip and instead of putting the airstrip on their own land they just decided to put it on Andy's and that their testimony from their own witnesses that they took somewhere around 10 acres of his ground, would you assume those things for me to be true to be evidence before this jury?

A. Yes, sir.

* * *

Q. I would like for you to tell this jury if $50.00 an acre loss per acre to that bean land down there would be a fair figure?

A. Yes, sir."

Mr. Doyle, who certainly should have known more about this case than any witness who testified, did not testify at all. As to the loss of land in the airstrip on the "One Camp" area, the lease covered 1,500 acres more or less. There is no competent evidence in the record that the airstrip was built on "bean land," or that it was built after Mr. Doyle leased the land, or that Mr. Doyle did not still have 1,500 acres more or less after the airstrip was constructed, or that Mr. Doyle would have planted beans or anything else on the airstrip land had it not been used for an airstrip.

We conclude that the judgment in favor of Mr. Doyle on his counterclaim must be reversed and this cause should be remanded for a new trial on his alleged elements of damage as a set-off against the judgment in favor of the state.

Reversed and remanded.